[Civ. No. 1092. Third Appellate District.—June 6, 1913.]

## P. M. DODGE, Respondent, v. NORTHERN ELECTRIC RAILWAY COMPANY (a Corporation), Appellant.

CARRIER—EJECTION OF PASSENGER WHO HAS TAKEN TRAIN BY MISTAKE.—In this action by a passenger ejected from an electric train which he had taken by mistake, supposing that it was going to his destination, the evidence is sufficient to sustain a finding that he was removed from the train with unnecessary force by the brakeman and suffered injury as a consequence.

Id.—Action by Passenger—Examination of Witness.—A question addressed to the plaintiff, in his action for injuries from being ejected from a train, for the purpose of eliciting an admission from him that he was not injured, and that the institution of the action was because of the entertainment of ill-will toward the defendant, rather than because of any damage suffered, is proper.

Id.—Damages for Wrongful Expulsion of Passenger.—A passenger induced by a carrier to board the wrong train may recover from the carrier such damages as result directly therefrom.

Witness—Sustaining Objection to Question—Harmless Error.— Error in sustaining an objection to a question to a witness is not prejudicial, if thereafter the same question is in effect propounded and its answer allowed.

Appeal—Review of Ruling on Demurrer.—A ruling on a demurrer to a pleading, or upon the sufficiency thereof, cannot be reviewed on an appeal from an order denying a new trial, but only upon an appeal from the judgment.

APPEAL from an order of the Superior Court of Yuba County refusing a new trial. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

Charles W. Slack, A. M. Seymour, and W. H. Carlin, for Appellant.

H. D. Gregory, for Respondent.

HART, J.—This is an action by the plaintiff to recover the sum of ten thousand dollars as damages for personal injuries. The jury, before whom the cause was tried, returned a verdict in favor of the plaintiff for the sum of six hundred dollars.

This appeal is by the defendant from the order refusing to grant it a new trial.

Insufficiency of the evidence to justify and support the verdict, errors in rulings upon the evidence, and error in overruling the demurrer specially directed against certain averments of the complaint, are the main points relied upon for a reversal.

1. The plaintiff, 62 years of age and a resident of Thermalito, Butte County, having visited and been in the city of Marysville, on the first day of November, 1911, on the after-

noon of said day went to the depot of the defendant in the
last mentioned city and purchased a ticket entitling him to
transportation on the defendant's railway train from said
city to his home. It appears that at the hour when the plain-
tiff should have boarded a train which would have taken him
to Thermalito, two trains met at Marysville—one north bound,
going to Thermalito, Oroville and other points north of
Marysville and the other south bound and whose destination
was Sacramento. The plaintiff erroneously boarded the train
bound for Sacramento, and the mistake was not discovered
until the conductor, after the train had proceeded some two
or three miles out of Marysville, came into the car in which
the plaintiff was riding and called upon the passengers for
their tickets. What occurred thereafter was thus described
by the plaintiff at the trial: "He (referring to the conductor)
said 'tickets,' and I raised up and handed him my ticket.
He took the ticket and looked at it and said: 'What in h—ll
are you doing on this car, it is a Sacramento car; I have no
time to fool with you, it is late now, and I haven't time to
let you off,' and I said, 'If you stop the train I will get off
and walk back.' He rushed back and rang the bell. He
called the brakie and told him to let me off at the siding.
The brakie grabbed and got the bell rope and rang it. I
don't know how many bells he rang. He told me to come on.
I do not know where the conductor went. The brakie took
the lead and went to the door and went to the platform and
I followed him out on the platform and he said: 'Get down
there on to the steps so as to be ready and not take any more
time than possible,' and I got on the steps and had hold of a
rod. The rod was on the end of the car for persons to hold
on in going down the steps of the platform step. He told
me to jump and I said, 'If you stop the car I will get off,'
and I said, 'No, I can't do that; if you stop the train I will
get off.' About that time something struck me in the back,
in the lower part of the shoulder, and about that time I was
off." He testified that he did not know what struck him or
how he was struck, but that the impact "didn't feel very
much like something very hard or very soft, but it gave me
a quick shove." Explaining the manner of his fall to the
ground and the extent of the injuries thus received, he testi-
fied: "I fell head first on the left side. I struck on the

22 Cal. App.—16

ground and rock and gravel in the wagon crossing. My face struck on the ground here (showing) and over this eye and this cheek (showing). It cut me in all three places. As soon as I broke loose from the rod I threw my hands this way (showing), and it caught me on the heel of the hands and bruised it." He further testified: "It was dusk. I got up and I followed the railroad track back to Marysville. It took me three-quarters of an hour or an hour to get back to Marysville. . . . I used the same ticket to go home to Thermalito that I had presented to the conductor going south on the wrong train. . . . I was very lame and sore as the result of the injury through this side and this shoulder (indicating the left shoulder) and the heel of my hands where I struck the ground. I had a swelling on my left knee. I am suffering yet. . . . When I felt the shoving on the back the brakeman was standing on the top of the steps of the platform. No one else was there. Next morning after I got home I went to dust my coat. There was dust all in it. On the back of my coat I saw the point of something rounding like the front part of a shoe and there was streaks, yellowish streaks there." The plaintiff testified that, on the day following that upon which he received his injuries, he called on and was treated for said injuries by Dr. Wilson of Oroville, and that thereafter he called at the office of the doctor for the same purpose on several different occasions.

The witness, Moore, who was a neighbor of the plaintiff in Thermalito, testified that he remembered the occasion when the plaintiff returned from Marysville. His best recollection was that it was two or three weeks prior to Thanksgiving Day. "His face," said this witness, "was all cut up and cut along the forehead and along the cheek in three or four places. When he turned around to walk from me he walked lame. . . . He went around lame and bent over for ten days or two weeks."

Chester Kelley, who resided about five hundred feet from the home of the plaintiff, testified that he saw the latter at about 8 or 9 o'clock in the morning of November second. "Mr. Dodge's clothes were very dusty," he stated, "and his face was scratched in numerous places, on the left cheekbone, the chin; rather bad bruises. I saw his left wrist. It appeared to be swollen. I looked at the back of his coat.

There was dust there. I saw a mark. It appeared as a footprint. This was the day after he returned from Marysville.''

There was some other testimony slightly corroborative of the plaintiff, but the reproduction of the foregoing is sufficient for the purposes of the decision of the point under consideration.

There was no other person on the platform from which the plaintiff left the car or who witnessed the circumstances thereof but the brakeman, Clarence Ruth, and he testified that the train came to a standstill at Alicia station, where the plaintiff alighted, before the latter attempted to leave the platform upon which he was standing; that the plaintiff descended from the platform to the ground in the usual or ordinary way, and that he (Ruth) did not touch the plaintiff nor use any force whatever upon him as he was in the act of leaving the car.

The conductor, Caverly, declared that when, on collecting the tickets, he discovered that the plaintiff was on the wrong train, he told the brakeman to signal the motorman to stop at Alicia, the next station, so as to let the plaintiff leave the train and catch the up-going train at that station. At Alicia, he said, the train came to a standstill for that purpose.

Many other witnesses testified that the train stopped a short distance out of Marysville, but some of these did not know the name of the station at which the stop was made.

A large number of witnesses, neighbors, and acquaintances of the plaintiff, was introduced by the defendant, and they testified that the plaintiff's general reputation in Thermalito for truth, honesty, and integrity was not good.

Manifestly, upon the testimony given in the case and of which the foregoing is a brief synopsis, this court cannot justly hold that the verdict was not justified by the evidence, unless we are prepared to say that the testimony of the plaintiff is so unreasonable upon its face as to be unworthy of belief or entitled to absolutely no credit anywhere or at the hands of any person or tribunal.

The vital questions in this case are: 1. Was the plaintiff removed from the train by the defendant or its agent by means of unnecessary force? and, if so, 2. In so doing, did

the defendant inflict or cause to be inflicted upon the plaintiff bodily or physical injuries?

From the evidence produced in behalf of the plaintiff, the jury were clearly warranted in answering, as they did, these questions in the affirmative. The positive denial by the brakeman of the salient facts to which the plaintiff testified merely raised a sharp and substantial conflict, and it was obviously for the jury to decide which of the two witnesses told the truth concerning the transaction. And even if, for reasons which to our minds might appear to be forceful, we were of the opinion that the evidence upon which the verdict was manifestly predicated was unworthy of belief, it being sufficient to sustain the verdict and not so improbable upon its face as clearly to constitute it a question of law, and the jury having seen fit to credit it, this court would have no legal right to disturb the verdict, that power resting solely in the trial court before which the trial was had and by which, equally with the jury, the testimony was heard. Nor can we say, as a matter of law, that the plaintiff was impeached, notwithstanding that a long list of witnesses, whose testimony upon the point was not contradicted, testified that his reputation for truth, honesty, and integrity was bad. It is to be conceded that, the testimony of these witnesses not having been shaken by cross-examination or they themselves impeached or contradicted, the case upon its face does not present a very favorable appearance for the plaintiff, yet it cannot be said that a witness is impeached, within the juridical meaning of that term, until the tribunal which is to directly pass upon and decide the questions of fact shall have determined that his testimony for that reason is to be disregarded in the decision of the issue of fact to which it was addressed. It will not be disputed that it was within the province and the power of the jury, as the court in plain and explicit language instructed them, to disbelieve the testimony of any witness. Of course, this power may not be arbitrarily exercised, but how can a reviewing court say when it is or is not so exercised in a case, even where, as here, the testimony bears upon its face the appearance of being true? How can this court declare that there was not something in the manner of each of these witnesses, as he gave his testimony, which generated in the minds of the jury disbelief in

or doubt as to the verity of his characterization of the general reputation of the plaintiff for the traits mentioned? Moreover, the jury could have believed the impeaching testimony, and still, without necessarily being inconsistent, have believed, in view of the corroborating evidence or of other reasons perfectly satisfactory to themselves, that the plaintiff told them the truth as to the circumsances under which he left or was removed from the train. Furthermore, if the trial court, in the consideration of the motion submitted to it by the defendant for a new trial, could not justly say, as presumptively it could not from its ruling thereon, that the jury erred in apparently disregarding the impeaching testimony, how may this court, not in a position to apply the usual tests determinative of the credibility of witnesses or the weight, if any, which should be accorded their testimony, be consistently expected to so declare?

As before stated, under the state of the record as it is presented here, so far as the evidence is concerned, there is, in view of the well-established and well-understood rule by which appellate courts in this state must be guided in the consideration and decision of such questions, open to this court no other course than to hold that the evidence is sufficient to support the verdict, even though, in reality, it might not have justified the jury in returning said verdict.

On cross-examination the plaintiff was asked the following question by counsel for the defendant: "Isn't it a fact that the idea of injury on your part and of the suit against this defendant had its birth while you were coming back to Marysville, after being put off the train while it stopped for you down there?" An objection to this question was sustained by the court. It is now claimed that the ruling was erroneous and prejudicial. The obvious purpose of the question was to secure an admission from the plaintiff that, as a matter of fact, he was not in any manner or degree injured, and that the institution of this action by him was not because he suffered any damage at the hands of the defendant, but because of the entertainment by him of personal ill-will toward the company. The question was a proper one, but the ruling foreclosing an answer thereto was not prejudicial, for thereafter the same question was in effect propounded to the plaintiff by the defendant and an answer thereto allowed.

3. It is next complained that the court erred in approving the objection to the question to the witness Caverly, defendant's conductor: "To your best judgment did the train at Alicia at that time come to a dead stop?" The question was no doubt intended to call for the best recollection of the witness as to whether the train did or did not come to "a dead stop," and thus viewing it, it was a proper question. The ruling disallowing an answer to it, however, was not prejudicial, in view of the following statement previously made by the witness: "Whether or not that train actually came to a dead stop, I cannot state, for there was nothing at the time to particularly impress the incident on my mind. I will not swear that the train came to an actual dead stop. I did not have anything more to do with putting the man off the train after I called the brakeman." The foregoing testimony appears to represent the "best judgment" or the best recollection of the witness respecting the circumstance.

4. The objection that the court erred in overruling the demurrer to the complaint cannot, even if it were tenable, be availed of by the defendant. Although the preamble to the bill of exceptions states that said bill is to be used "on the motion for a new trial herein, and also on appeal to the district court of appeal *from the judgment* made and entered herein," there is no evidence in the record of an appeal having been taken from the judgment, and, of course, in the absence of such an appeal, the ruling of the court on the demurrer cannot be reviewed. In other words, a ruling on a demurrer to a pleading or upon the sufficiency thereof cannot be reviewed on an appeal from an order denying a new trial. (Hayne on New Trial and Appeal, sec. 186; *Fortain* v. *Smith*, 114 Cal. 494, [46 Pac. 381]; *Frey* v. *Vignier*, 145 Cal. 251, [78 Pac. 733].) We may, however, with no impropriety, say that, even if the point were reviewable, we would be compelled to hold it not to be well taken. The objection to the complaint and the argument in support thereof arise as follows: The pleading sets out two different and distinct grounds of alleged negligence upon the part of the defendant, viz: 1. That the plaintiff, through the negligence of the defendant, boarded the wrong train and was thus carried some distance in the wrong direction. 2. Injuries received

by the plaintiff when, as he claims, he was forcibly ejected from the train.

It is the first of the foregoing propositions which is challenged by demurrer for uncertainty, and the argument is that there is "no rule of law which makes a railroad company responsible for a passenger taking the wrong train, and that it is impossible to determine how much the jury may have awarded the plaintiff because of his alleged injuries occurring at the time he left the car and how much they may have allowed him for the inconvenience of being carried in the wrong direction and being compelled to retrace the distance of approximately two miles on foot."

The first reply to this argument is that the court, in its instructions, confined the jury in the determination of the question of damages exclusively to the consideration of the injuries alleged to have been received by the plaintiff when leaving the train. Nowhere in its charge did the court refer to the alleged negligence of the defendant in causing the plaintiff to take the wrong train. Furthermore, the portion of the complaint objected to does not seek to make the defendant "responsible for a passenger taking the wrong train," but alleges, as we have seen, that "through the negligence of defendant plaintiff entered said train," etc., and we know of no rule of law which would preclude a recovery for such negligence, if it were shown that damage directly followed therefrom.

No substantial reason has been shown for a reversal of the order, and it is, therefore, affirmed.

Chipman, P. J., and Burnett, J., concurred.